OPINION OF THE COURT
Walter J. Relihan, Jr., J.
The defendant Welch performed roofing work on a building *108 owned and occupied by Challenge Industries, Inc. (Challenge). Plaintiff, an employee of Challenge, alleges that the work was negligently performed, causing dust, fumes and particles to filter into the building, rendering her ill.
Plaintiff, for many years prior to these November 1994 events, had been regularly treated for allergies, asthma, fibromylagia (a form of muscular arthritis), anxiety and mild depression. In following weeks, she was treated or evaluated by several physicians of different specialties. Many laboratory, X-ray, blood chemistry and pulmonary function studies were performed, all of which yielded results which were within normal limits. In February 1995, an evaluation and opinion were obtained from a physician who diagnosed “chemical fumes and dust related bronchial asthma” but concluded that most of her symptoms were psychosomatic and that she had no disability from her exposure of November 1994.
Her personal physician, however, is prepared to testify that these exposures not only caused irritation of the plaintiffs eyes, nose and lungs, but also depressed her immune system, rendering her hypersensitive to a wide variety of chemical compounds found commonly in the environment. These sensitivities, he states, cause recurring multiple symptoms at levels of exposure which are well below those which are tolerated, without palpable harm, by the general population. His diagnosis is multiple chemical sensitivity (MCS) syndrome resulting in a substantial permanent disability.
There is evidence that the fumes and particles falling from the roof area adversely affected other employees to a minor degree (see, plaintiffs exhibit C, Nov. 11, 1994 bulletin of Challenge Employee Advisory Comm which states: “The noise and smell made it hard for people to work. Particles from the roof got into some people’s food and several complained of burning in the throat, headaches, or trouble with breathing”). In May 1995, an Administrative Law Judge at the Workers’ Compensation Board made an award to plaintiff for “aggravation of chemical sensitivities” (plaintiffs exhibit G). The Board’s medical report contains no diagnosis. The examiner merely describes symptoms and certain findings, to wit: “cardiopulmonary symptoms and headaches * * * signs of anxiety with tachycardia * * * lungs clear”.
The plaintiffs proposed expert witness has held a variety of medical posts which, generally, have involved routine medical evaluations of employees. He conceded, at his deposition, that *109 (1) there is no diagnostic test for MCS; (2) there are no studies which identify a mechanism or cause for MCS; (3) the witness himself does not know what mechanism causes MCS; (4) there are no studies which establish a causal relation between certain chemicals and MCS; and (5) he does not know what specific chemicals plaintiff was exposed to on November 7 and 8, 1994 due to the roofing work conducted by defendant Welch. Most importantly, he concedes that his diagnosis of MCS “had not achieved general acceptability within the field of medicine” (Hipp examination before trial, at 69).
Defendants move to dismiss the complaint or, in the alternative, to preclude the testimony of plaintiffs physician, to the extent that any such evidence involves an MCS diagnosis. Having conducted a Frye v United States (293 F 1013) hearing, we conclude that the diagnosis of MCS has not gained general acceptance in the relevant scientific community and, hence, that opinion testimony in support of such a diagnosis is not admissible.
The Frye rule still reigns in New York (People v Wesley, 83 NY2d 417). Expert testimony based on scientific principles or procedures is admissible in this State, but only after such principles or procedures have gained general acceptance in the relevant discipline (People v Wesley, supra, at 422; People v Angelo, 88 NY2d 217, 222-223; People v Roraback, 242 AD2d 400). The rule is equally applicable in civil actions (Castrichini v Rivera, 175 Misc 2d 530).
The Federal Rules of Evidence enact a somewhat different standard. Rule 702 provides that, where scientific knowledge will assist the trier of fact, a witness with germane credentials may offer an opinion on the issue. Needless to say, the testimony must be relevant as defined by rule 401 (i.e., having any tendency to make a fact in issue more or less probable than would be the case without the evidence). Generally speaking, under the Federal Rules of Evidence, all relevant evidence is admissible.
The United States Supreme Court, in Daubert v Merrell Dow Pharms. (509 US 579), held that the terms “scientific” and “knowledge”, found in rule 702, connote something more than subjective belief or unsupported speculation but that something less than general acceptance in the scientific community may suffice. Noting that few scientific propositions are indisputable, the Supreme Court directed the Federal trial courts to focus upon the expert’s methods and reasoning rather than the conclusion to be propounded. The Judges’ gatekeeping respon *110 sibility, the Court held (at 592-593), requires an analysis of “whether the reasoning or methodology underlying the testimony is scientifically valid”, adding that (at 593): “We are confident that federal judges possess the capacity to undertake this review.” While general acceptance remains an important consideration, it is no longer the sine qua non. In short, the Federal Rules of Evidence permit the submission of opinion evidence, by a credentialed witness, if the opinion is based upon a scientific methodology which is deemed reliable by the Trial Judge.
New York, by contrast, requires the court to determine that a general acceptance of the methodology has become established in the relevant scientific community. “Thus, under Frye, the trial judge does not determine whether a novel scientific methodology is actually reliable. Rather, the judge determines whether most scientists in the field believe it to be reliable * * * Put another way, the general acceptance test is a surrogate for determining the reliability of a purported scientific methodology.” (Martin, Capra and Rossi, New York Evidence Handbook § 7.2.3, at 644, citing People v Wesley, supra, 83 NY2d, at 439 [concurring opn of Kaye, Ch. J.], quoting Jones v United States, 548 A2d 35, 42 [DC Ct App] [“The Frye test emphasizes ‘counting scientists’ votes, rather than on verifying the soundness of a scientific conclusion’ ”].)
The Federal courts, since Daubert (supra), have encountered the MCS diagnosis on a number of occasions. Two recent cases have been decided in the Northern District of New York, Frank v State of New York (972 F Supp 130) and Carlin v RFE Indus. (1995 WL 760739 [ND NY, Nov. 27, 1995, Scanlon, J.]). The opinion in Frank (at 136 [McAvoy, Ch. J.]) notes that “Every federal court that has addressed the issue of the admissibility of expert testimony on MCS under Daubert has found such testimony too speculative to meet the requirements of ‘scientific knowledge’ ”, and cites additional District Court decisions to the same effect.
Plaintiff, however, points to Kannankeril v Terminix Intl. (128 F3d 802), decided by the United States Court of Appeals for the Third Circuit, as evidence that the MCS diagnosis has now passed the Daubert threshold. There, the plaintiffs residence had been repeatedly sprayed with pesticides. The plaintiff claimed that the substances, concededly toxic, had been sprayed excessively and improperly in the home. The evidence showed that one of the active ingredients, Dursban, operates “by inhibiting the normal breakdown of acetylcholine, *111 which functions as a neurotransmitter in several life forms, including humans” (supra, at 805). A highly qualified tosdcologist was prepared to testify, based on a summary report of the times and amounts of the Dursban applications in the home, that plaintiffs central nervous system disorder was caused by exposure to Dursban.
This evidence, in our view, not only meets the Daubert test but may leap the Frye hurdle as well. In any event, we reject the proposition that the Third Circuit ruling is inconsistent with the conclusions reached in Frank and Carlin (supra). On much more pertinent facts, the Court of Appeals for the Seventh Circuit affirmed the exclusion of an MCS diagnosis. There, the court noted that the first and most significant of the admissibility tests discussed in Daubert (supra) requires the Trial Judge to determine whether the inference or assertion to be offered by an expert had been derived by the scientific method (Bradley v Brown, 42 F3d 434, 438). The court affirmed the ruling of the District Court (852 F Supp 690) that the MCS diagnosis was not derived by a scientific method and, therefore, was not reliable and could not truly “assist” the trier of facts, within the meaning of rule 702.
Frye and Daubert (supra), in the greater number of cases, will produce similar results. There may be instances, however, in which the criterion of general acceptance by the relevant scientific community will play a decisive and differentiating role. This is such a case. The present Federal rule, which dethrones the general acceptance test, is the expression of a reformist zeal to clear the underbrush and open all pathways to the truth. The Frye rule, in that context, is contrariant. Nevertheless, it faithfully reflects and supports the traditional reluctance of the common law to upset established liberty and property interests without good cause, supported by a preponderance of credible and reliable evidence.
We conclude that the defendant’s motion should be granted to the extent that it seeks an order to preclude the offer of expert testimony in support of the MCS syndrome diagnosis. The claim of bronchial injury caused by chemical fumes and dust, attributable to the negligent performance of roofing work, remains viable if supported by competent evidence at trial.
The plaintiff cross-moves to preclude Challenge from offering evidence to contradict the finding of the Workers’ Compensation Board that plaintiff suffered an “aggravation of chemical sensitivities”. The issue will not arise unless and until the plaintiff establishes a causal relation between an injury, other *112 than MCS, and the negligence of Welch. Should that occur, it is not yet evident that Welch will be able to show that Challenge, by some act or omission on its part, was a contributor to any wrong visited upon the plaintiff. The cross motion is premature and, consequently, is denied without prejudice. We note, by way of adumbration, that the collateral estoppel effect of the compensation award, on these unique facts, is far from clear (Gilberg v Barbieri, 53 NY2d 285, 292; Martin v Reedy, 194 AD2d 255, 259-261).