*61 OPINION OF THE COURT
Robert A. Ross, J.
These voluminous motions/cross motions are consolidated by this court for a single determination, sua sponte, as an exercise of discretion and in order to make “such other orders concerning proceedings therein as may tend to avoid unnecessary costs or delay.” (See CPLR 602 [a].) To the extent that each of these motions relate to competing requests for visitation/custody pendente lite, they are consolidated and decided as follows:
This matter, with all of its acrimony, is reflected by serious and conflicting allegations. The difficulty in determining an accurate factual scenario is further compounded by voluminous affidavits/affirmations, reports by a forensic psychologist who later removed himself from the proceedings, as well as the recurring assertion of parental alienation alleged to have been perpetrated by the plaintiff.
Unfortunately, the difficulty in this now four year old proceeding has manifested itself to a scenario in which the two oldest children now reside with the plaintiff, and the youngest child now resides with the defendant. The contact between the children is strained, infrequent and unmeaningful. The two oldest children reside with the plaintiff and have no contact with their mother — the youngest child resides with the defendant and has almost no contact with her father.
In an effort to understand and sort the contorted facts, the court has conducted in camera interviews with the children, has spoken with the law guardians assigned, and also directed the subpoena of the Family Court file, all to facilitate and assist in the determination of custody and visitation. Where serious allegations are made in a custody proceeding, and to some extent corroborated, the court has the duty to become aware of and seek out every bit of relevant evidence and advice on the subject, including forensic examinations. (Audubon v Audubon, 138 AD2d 658.) Towards that end, all of the forensic examination reports were reviewed and scrutinized.
The recurring theme herein has been the assertion of the “Parental Alienation Syndrome” (PAS). The theory, which had been developed by Dr. Richard Gardner in the early 1980’s, has been described by him as:
“The programming of the child [/children] by one parent, into a campaign of denigration directed against the other. And the second component is the child’s own contributions that dovetail and complement the contributions of the programming parent. *62 It is this combination of both factors that warrants the term parental alienation syndrome.” (See People v Fortin, 184 Misc 2d 10, 12 [internal quotation marks omitted].)
In Fortin, Dr. Gardner further described PAS as not being confined to conduct initiated between one parent and another — other persons in addition to immediate family members may be involved in conduct which involves the syndrome.
No cases in New York have been found to permit admission of expert testimony concerning PAS. The issue of the admissibility of expert testimony concerning PAS had been denied in two lower court matters, People v Fortin (supra) and People v Bimonte (185 Misc 2d 390 [Grim Ct, Queens County]). In both cases, the expert testimony was not permitted.
In Fortin, the court (Kowtna, J.) determined that the defendant had not established general acceptance of the Parental Alienation Syndrome within the professional community which would provide a foundation for its admission at trial. However, it is significant because it was the first time that the concept of the PAS was the subject of a “Frye” type hearing* in New York State.
In Bimonte (Heffernan, Jr., J.) the motion to allow an expert to testify on the Parental Alienation Syndrome was predicated on defendant’s assumption that the subject children would be testifying in the criminal case by closed circuit monitoring. When the court denied the People’s application to have the children declared as “vulnerable witnesses” (CPL 65.20), the application to permit the expert to testify on PAS was denied as moot.
The concept of PAS has been the subject of innumerable law review articles: Nole, Parental Alienation Syndrome: A Dangerous Aura of Reliability (27 Loy LA L Rev 1367 [1994]), Nigges-meyer, Parental Alienation Is Open Heart Surgery: It Needs More Than A Band-Aid To Fix It (34 Cal W L Rev 567 [1998]), Borris, Interference With Parental Rights Of Noncustodial Parent As Grounds For Modification Of Child Custody (8 Divorce Litig 1 [1997]), and Sherman, Gardner’s Law: A Controversial Psychiatrist and Influential Witness Leads The Backlash Against Child Sex Abuse Hysteria (Natl LJ, Aug. 16, 1993, at 1, col 2; see also, Brandes, Parental Alienation Syndrome, NYLJ, Mar. 28, 2000, at 1, col 3).
*63 The threshold standard for admissibility of novel scientific evidence in New York State is the “Frye rule (see Frye v United, States, 293 F 1013, 1923), which requires that novel or innovative scientific evidence be “based on * * * a principle or procedure [which] has ‘gained general acceptance in its specified field (People v Wesley, 83 NY2d 417, 422 [1994], quoting Frye v United States, supra at 1014). In this instance, it must be noted that the concept of Parental Alienation Syndrome is not yet listed as a diagnosis in the Diagnostic and Statistical Manual of Mental Disorders. (See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, at xxiii [4th ed 1994].)
However, the particular procedure need not be “unanimously endorsed by the scientific community but must be “generally accepted as reliable (People v Middleton, 54 NY2d 42, 49 [1981]). The burden is upon the proponent to “show the generally accepted reliability of such procedure in the relevant scientific community through judicial opinions, scientific or legal writings, or expert opinion other than that of the proffered expert. (See, Cameron v Knapp, 137 Misc 2d 373, 375 [Sup Ct, NY County 1987] [emphasis added]; People v Wilson, 133 AD2d 179.)
Frye has been applied with increasing frequency to the “soft sciences (psychology, sociology, psychiatry). (See, Walter J. Relihan, Jr., Considering the Frye Rule in New York Justice, NYLJ, Sept. 15, 2000, at 1, col 1.) As succinctly articulated by Justice Relihan, “When a circle of suitably knowledgeable and supportive investigators can be found, the opinion evidence has been admitted. (Id.; see, for example, People v Taylor, 75 NY2d 277 [Rape Trauma Syndrome]; Matter of Nicole V., 71 NY2d 112 [Sexually Abused Child Syndrome]; People v Henson, 33 NY2d 63 [Battered Women’s Syndrome].)
The reliability here can be established in two ways. (See For-tin, supra,.) The general acceptance would be so “apparent, open and notorious that the court could take judicial notice, or the acceptance could be established by legal writings and opinions (Prince, Richardson on Evidence § 7-311, at 476 [Farrell 11th ed]).
The Frye rule, while utilized in criminal cases, is “equally applicable in civil actions. (Collins v Welch, 178 Misc 2d 107, 108; Cameron v Knapp, supra.)
New York courts appear to have embraced the concept of parental alienation in custody/visitation cases, but have not yet recognized the theory through expert opinion evidence. *64 “Generally, the New York Courts, in the context of a custody/ visitation case, rather than discussing the acceptability of‘PAS’ as a theory, have discussed the issue in terms of whether the child has been programmed to disfavor the non-custodial parent, thus warranting a change in custody.” (See, Gassman and Tippins, Evidence in Matrimonial Cases, at 93.)
Matter of J.F. v L.F. (181 Misc 2d 722) was the first reported New York case to discuss the theory of PAS in the context of custody decisions. The court did not specifically base its decision on a finding of PAS, but instead utilized case law holdings relating to interference with the child’s relationship with the noncustodial parent. It was on this basis that the court ultimately granted sole custody to the father and suspended the mother’s right to visitation. (See also Daghir v Daghir, 82 AD2d 191.) This followed a line of cases that indicated that interference with the child’s relationship with the noncustodial parent has been said to be so inconsistent with the child’s best interest as to per se raise a strong probability of unfitness. (See also, Maloney v Maloney, 208 AD2d 603; see also, Brandes, Parental Alienation Syndrome, NYLJ, supra.)
The subject of parental alienation has not been limited to custody cases. It has been utilized as an allegation of “cruel and inhuman” treatment in an action for divorce. (See R.B. v S.B., NYLJ, Jan. 21, 2000, at 27, col 3.) Citing case law indicating that the duration of the marriage is a significant factor, Justice Tolub held that the acts of attempted parental alienation alleged by the husband were insufficient to establish cruel and inhuman treatment, and denied a motion to amend a complaint. However, during the ensuing fault trial and financial trial, even though no divorce was granted, the court found that the father/son estrangement resulted from the wife’s conduct over the years. After the dismissal and in subsequent litigation between the parties when the action was recommenced, the court (Silberman, J.) held that a jury must decide whether the treatment rose to the level of endangering the husband’s well-being. “Parental Alienation (the term of art for conduct resulting in the poisoning of a child’s mind against a parent), has become increasingly prevalent in troubled marriages.” (R.B. v S.B., supra, NYLJ, Jan. 21, 2000, at 27, col 1.)
Accordingly, to the extent the court has the duty to become aware of and seek out every bit of relevant evidence and advice on the custody issues before it (see Audubon, supra), and such expert testimony could potentially serve as a “helpful tool” in *65 determining this difficult custody dispute (Barnett v Barnett, 80 AD2d 717), the court sua sponte will permit the defendant to proceed with a “Frye” type hearing prior to the trial of this matter, at which time the defendant will have the opportunity to establish admissibility of expert testimony on the theory of Parental Alienation Syndrome.
While acceptance of expert testimony on the “Parental Alienation Syndrome” in a civil matter would appear to be of first impression, .the safeguards of Frye will enable this court to properly determine its admissibility.
In the interim and pending the trial of this matter, the parties are directed to submit, within 20 days of the date of this order, a detailed schedule of proposed custody/visitation as would otherwise be required to be contained in a statement of proposed disposition and which have not as yet been filed. (See Uniform Rules for Trial Cts [22 NYCRR] § 202.16 [h] [1] [viii].)
Accordingly, it is ordered that the defendant is granted a “Frye” hearing to establish admissibility of expert testimony on the issue of Parental Alienation Syndrome; and it is further ordered that such hearing shall be conducted immediately prior to the trial of this action; and it is further ordered that the remaining branches of the motion(s) and cross motion(s) are otherwise denied; and it is further ordered that, within 20 days of the date of this order, both parties shall file a detailed schedule of proposed custody/visitation.

 It is worth noting .that in Fortin, the Nassau County District Attorney joined in the defendant’s request for a “Frye” hearing.