*315 OPINION OF THE COURT
Victor M. Ort, J.
In response to defendant John Kogut’s omnibus motion, the People cross-moved for an order precluding defendant from offering expert testimony concerning “postmortem hair banding” on the ground that this scientific evidence is not generally accepted in the relevant scientific community. By order dated December 1, 2004, the court granted a Frye hearing to determine the admissibility of the proffered evidence. (See People v Kogut, 6 Misc 3d 1011[A], 2004 NY Slip Op 51775[U] [Sup Ct, Nassau County 2004].) The hearing was conducted on June 30, July 1, and August 1, 2, and 4, 2005. The oral argument was conducted on September 8, 2005. The court commends both Mr. Biancavilla and Mr. Casteleiro for the outstanding manner in which this issue was presented to the court.
Before proceeding to consider the scientific methodology for analyzing postmortem hair banding, the court will review its relevance to the present charges. In May 1986 defendant John Kogut was convicted of the rape and murder of Theresa Fusco. Codefendants John Restivo and Dennis Halstead, who were tried separately from Mr. Kogut, were convicted in December of that year. At the Restivo/Halstead trial, the People introduced evidence that a hair, identified as coming from the victim, was recovered from Mr. Restivo’s van. The defendants then called Dr. Peter De Forest, an expert in the field of criminalistics, to testify concerning whether the hair did in fact come from the victim. In rebuttal, the People called Nicholas Petraco, a detective with the New York City Police Department. Detective Petraco testified that he had compared the hairs taken from the victim at the autopsy with those purportedly taken from the van, by examining both specimens under the microscope, and concluded that they were identical.
In June 2003 this court, upon consent of the People, granted the defendants’ motions to vacate their judgments of conviction upon the ground that newly discovered DNA evidence appeared to exculpate the defendants with respect to the rape charges. Dr. De Forest and Mr. Petraco are the expert witnesses whom the defendant now proposes to call at the retrial to testify that the hair purportedly recovered from Mr. Restivo’s vehicle displays a phenomenon known as postmortem hair banding.
According to Dr. De Forest and Mr. Petraco, postmortem hair banding occurs only when the hair begins to decompose inside the hair follicle, while still on the head of the deceased. The *316 People’s theory of the case is that the victim’s body was disposed of by the perpetrators shortly after the rape and murder. However, according to defendant’s experts, the victim’s body would not have been in the van long enough for postmortem hair banding to occur. Defendant argues that, if, as the expert maintains, this distinctive hair banding occurs only while the hair is still on the head of the deceased, the hair must have been removed from the deceased’s head and planted in the van by someone involved in the investigation of the murder.
Dr. De Forest is a professor of forensic science and an expert in the field of criminalistics, which is the application of scientific techniques in collecting and analyzing physical evidence in criminal cases.[1] Among many other professional society and advisory committee memberships, Dr. De Forest is a member of the Scientific Working Group on Materials Analysis which is sponsored by the Federal Bureau of Investigation (FBI).
Dr. De Forest specializes in trace evidence, which is the analysis of materials tending to be small in size such as fibers, paint, glass and human hair. Trace evidence is a broad area within criminalistics and is divided into contact and noncontact traces. Within the area of noncontact traces, criminologists analyze the phenomena of droplets or particles being transferred from one surface to another without contact between the surfaces. Examples of these noncontact transfers are the familiar phenomena of gunshot residue and bloodstain patterns. In contact trace situations, two surfaces come into contact, and material is transferred across the contact boundary. A criminologist will microscopically examine the material exchanged in order to evaluate the existence of the contact. The most common example of contact trace evidence is fingerprints.
Nicholas Petraco is a forensic scientist and consultant. Prior to starting his own business, he was a detective and forensic scientist for the New York City Police Department. He holds a B.S. degree in chemistry and a Master’s degree in forensic science from the John Jay College of Criminal Justice.
According to Dr. De Forest and Mr. Petraco, postmortem hair banding is a phenomenon which is observed through microscopic examination of an individual hair shaft. The phenomenon occurs when an individual hair on the head of a deceased person *317 decomposes within the follicle.[2] The decomposition causes small spaces, or “canals,” to form near the root of the hair, and these air bubbles or canals serve to refract, or scatter, light. When a light source is transmitted through the hair sample, a “discontinuity in the light path,” or “opacity,” is observed, which is caused by the refraction of the light passing through the canals. Dr. De Forest and Mr. Petraco testified that when a hair shaft which had begun to decompose in the follicle is examined under a scanning electron microscope, an opaque, spindle-shaped band is observed in the area of the “proximal” end, near where the hair connects to the root. According to defendant’s experts, the banding will be observed in hairs taken from some portions of the scalp of the decedent, but not in hairs taken from other areas.
Dr. De Forest testified that the occurrence of this phenomenon is dependent upon a number of factors. The closer that the hair shaft gets to the surface of the skin, the greater the degree of keratinization. Keratin is a class of sulfur-containing fibrous proteins which contribute to the hair’s hardness.[3] The closer to the root, the lesser the degree of keratinization — making the hair softer and less protected — and the greater the susceptibility to digestion or decomposition of the hair shaft. However, the further from the root, the greater the accessibility to microbes, the bacteria which causes the decomposition.[4] According to Dr. De Forest and Mr. Petraco, while it ordinarily takes at least two days for postmortem hair banding to occur in a warm environment, the time period for postmortem hair banding to occur depends upon a number of factors. Both experts acknowledged that there is more work to be done to determine precisely how this phenomenon takes place, particularly as far as timing and temperature. They explained that such additional work will have to be done through case studies, as opposed to empirical research, because of the difficulty of controlling for temperature, humidity, and other variables.
*318 Dr. De Forest and Mr. Petraco testified that the technique for identifying postmortem root hair banding is generally accepted within the relevant scientific community, which they define as criminologists who are involved in trace evidence analysis. Included within this group are the FBI and various medical examiner’s offices and police laboratories.
Ms. Alison Domzalski is the criminologist who was called by the People. When Ms. Domzalski was working on her Master’s thesis with Dr. De Forest as her adviser, she observed hair banding produced not by decomposition in the follicle, but rather by exposure to the environment, as where the hair was submerged in water or soil.[5] Ms. Domzalski does not dispute that the phenomenon known as postmortem hair banding occurs. Rather, her research indicates that a similar phenomenon can be caused by other factors.
According to all three of the defendant’s experts, Dr. De Forest, Mr. Petraco, and Ms. Faye Ann Springer, a qualified hair examiner should be able to distinguish the two different types of hair banding through microscopic examination, although in certain situations an accurate determination cannot be made. According to Dr. De Forest, in the case of “classic root banding,” there is no indication of any digestion at the extreme proximal end. Nor is there any evidence of “erosion” or of any kind of “debris” that the hair would have come into contact with by exposure to the environment. Dr. De Forest acknowledged that his ability to differentiate postmortem root banding from that caused by the environment is in part a subjective judgment based upon his experience of observing the phenomenon.
The long-recognized rule of Frye v United States is that expert testimony based upon scientific principles or procedures is admissible but only after a principle or procedure has “gained general acceptance” in its specified field. (People v Wesley, 83 NY2d 417, 422 [1994].) The Frye rule of general acceptance in the relevant scientific community continues to be recognized by our Court of Appeals. (See e.g. People v Lee, 96 NY2d 157 [2001].) However, as the Second Department noted in Parker v Mobil Oil Corp. (16 AD3d 648, 651 [2d Dept 2005]), although *319 the Frye rule is controlling, “it is instructive to examine federal authority for purposes of discussion of accepted scientific methodology.”
In Daubert v Merrell Dow Pharmaceuticals, Inc. (509 US 579 [1993]), the Supreme Court held that in federal court the Frye rule is displaced by Federal Rules of Evidence rule 702. Rule 702 provides that if scientific knowledge will assist the trier of fact to understand the evidence or determine a fact in issue, a witness qualified as an expert may testify thereto in the form of an opinion or otherwise. In Daubert, the Supreme Court, in discussing the nature of scientific inquiry, articulated certain criteria that a trial court is to apply in “screening” scientific evidence and attempting to insure that it is reliable. The Court noted that the term “scientific” implies a grounding in the methods and procedures of science. (509 US at 590.) While the term “knowledge” connotes more than subjective belief or unsupported speculation, the subject of scientific testimony need not be known to a certainty. Arguably, there are no certainties in science. Scientists do not assert that they know what is immutably true, rather they search for new, temporary theories to explain phenomena as best they can. Science represents a process of proposing and refining theoretical explanations about the world that are subject to further testing and refinement. In order to qualify as “scientific knowledge,” an inference or assertion must be derived by the scientific method. In Daubert, the Supreme Court held that for scientific evidence to be reliable, it must be scientifically valid. Among the factors which the court may consider in determining whether a theory or technique is scientifically valid are (i) whether it can be or has been tested, (ii) whether it has been subjected to peer review and publication, (iii) the known or potential rate of error, and (iv) the degree of general acceptance within the scientific community.
As noted, in New York general acceptance within the scientific community is the touchstone for the admission of scientific evidence. However, given the nature of scientific inquiry, the reliability criteria identified by the Supreme Court in Daubert are useful to consider in applying the general acceptance standard. The court notes that Mr. Petraco’s, Dr. De Forest’s, and Faye Ann Springer’s qualifications as an expert in the field of forensic science are not subject to dispute. Furthermore, the technique of microscopic examination of the hair shaft is grounded in scientific method and procedure. The methodology *320 for identifying postmortem hair banding was published in the Journal of Forensic Sciences in 1988 and has been subject to peer review, albeit within a small community. The methodology has been tested to some extent in the form of case study analysis. The People’s expert, Ms. Domzalski, has replicated a similar phenomenon through factors other than decomposition in the follicle. However, the risk of error in distinguishing the two phenomena appears to be slight, at least upon microscopic examination, as opposed to merely studying a photograph of a slide. That Ms. Domzalski’s research will aid in refining our understanding of the hair banding phenomena is in the nature of scientific investigation generally and does not render Dr. De Forest’s work invalid. Thus, the court concludes that the methodology testified to by the defendant’s experts concerning postmortem hair banding is generally accepted within the forensic scientific community.
Aside from the state of the scientific analysis, other factors weigh in the court’s discretionary decision concerning the admissibility of this evidence. (People v Cronin, 60 NY2d 430 [1983].) Dr. De Forest’s conclusion concerning the hair sample originating from the victim suggests possible misconduct upon the part of law enforcement officials in the investigation of this case. The possibility of official misconduct and its potential effect on the integrity of the criminal justice system are factors which the court must consider in ruling upon the admissibility of this proposed expert testimony. Also to be considered is the critical concern for the authenticity of the physical evidence, which is offered to provide corroboration for defendant’s confession, the voluntariness of which is hotly contested by the parties. Based upon all the factors outlined above, the court rules that defendant’s evidence as to postmortem hair banding analysis will be admissible. (See State v Bunley, 805 So 2d 292 [La 4th Cir 2001].) In order to present a complete picture to the jury as to the validity and limits of the defendant’s experts’ analysis, Ms. Domzalski’s research will also be admissible.

. Merriam-Webster’s Collegiate Dictionary (10th ed).

. The phenomenon was first discovered by two Japanese scientists, Sato and Seta. They referred to it as “putrid root” and presented it at a meeting of forensic scientists at Oxford University in 1984. Dr. De Forest has coauthored an article on the phenomenon with Nicholas Petraco, Charles Fraas and Francis Gallery. At the time of the article, Petraco and Gallery were detectivecriminalists with the Crime Laboratory of the New York City Police Department. Fraas was a detective-criminalist with the Scientific Investigation Bureau of the Nassau County Police Department. The article was published in 1988.

. Merriam-Webster’s Medical Desk Dictionary.

. Ibid.

. A study done by Barbara Wager-Collins concluded that environmental factors do not produce this type of hair banding. However, the subjects who contributed the scalp material in that study had expired in a hospital, and some of them had undergone chemotherapy. Thus, the reliability of the Wager-Collins study is open to question.